UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| LANCELOT INVESTORS FUND. L.P., et al. | ) | Case No. 08 B 28225 |
| | ) | |
| Debtor. | ) | Judge Jacqueline P. Cox |
| | ) | |
| RONALD R. PETERSON, not individually but solely as Chapter 7 Trustee for Lancelot Investors Fund, L.P. | ) ) ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Adv. No. 10-02088 |
| | ) | |
| RITCHIE CAPITAL MANAGEMENT, LLC, RTL OPTIONS, LTD., and THANE RITCHIE CAPITAL, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION ON MOTION TO DISMISS (Dkt. No. 29)**

This matter is before the Court on the Motion of Defendants Ritchie Capital Management, LLC ("Ritchie Capital"), RTL Options, Ltd. ("RTL"), and Thane Ritchie ("Ritchie," together with Ritchie Capital and RTL, "Defendants") to dismiss the First Amended Complaint ("Complaint") filed by Ronald R. Peterson as Chapter 7 Trustee ("Trustee"). For the reasons noted herein, the Motion to Dismiss is GRANTED.

I. JURISDICTION AND VENUE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H). Venue is proper pursuant to 28 U.S.C. § 1409(a). The Seventh Circuit recently

1

ruled in *Ortiz v. Aurora Health Care, Inc.*, 665 F.3d 906, 914 (7th Cir. 2011) that a bankruptcy court does not have the authority to enter final orders on a summary judgment motion involving state law claims, the resolution of which did not involve an adjudication of the creditor's proof of claim. The Court notes, however, that an order dismissing an adversary proceeding "does not qualify as an appealable final judgment because the plaintiff is free to re-file the case." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 923 (7th Cir. 2003) (citing *Larkin v. Galloway*, 266 F.3d 718, 721 (7th Cir. 2001).

## II. FACTS AND BACKGROUND

The adversary proceeding in this matter was filed by the Trustee against the Defendants on behalf of Lancelot Investors Fund, L.P. ("Lancelot I"); Lancelot Investors Fund II, L.P. ("Lancelot II"); Lancelot Investors Fund, Ltd. ("Lancelot Ltd."); Colossus Capital Fund, L.P. ("Colossus LP"); and Colossus Capital Fund, Ltd. (Colossus Ltd." and collectively, the "Debtors" or the "Funds"). The Trustee asserts claims to avoid $12,532,973 in alleged constructively fraudulent transfers ("Transfers") under Section 548 of the Bankruptcy Code, the Uniform Illinois Fraudulent Transfer Act ("Illinois UFTA") and a state law claim for unjust enrichment.

The Trustee pleads the following allegations in the Complaint, which the Court construes as true for purposes of ruling on this Motion to Dismiss.

The Debtors consist of 19 related entities engaged in the operation of related hedge funds or special purpose vehicles. As of October 20, 2008 (the "Petition Date"), the date on which the Debtors filed for relief under Chapter 7 of the Bankruptcy Code, the Debtors collectively held assets listed on their books and records as approximately $1.8 billion. Those assets were comprised predominately of notes (the "Notes") purchased from a special purpose vehicle, Thousand Lakes,

LLC ("Thousand Lakes"), which was controlled by and affiliated with Thomas J. Petters ("Petters") and Petters Company, Inc. ("PCI"). The Notes were purportedly secured by certain goods and merchandise owned by Thousand Lakes and/or certain affiliated vendors, Enchanted Family Buying Company ("Enchanted") or Nationwide International Resources ("NIR") and/or certain receivables purportedly due from major retail chains.

Prior to the Petition Date, each of the Debtors was substantially controlled by Gregory Bell ("Bell"), through management companies Colossus Capital Management, LLC. ("CCM") and Granite Investment Management, LLC (later known as Lancelot Investment Management, L.P. or "LIM" and together with CCM, the "Management Companies") set up by Bell to manage the operations of the investment funds. Under applicable limited partnership and other agreements, the authority to make day-to-day decisions on behalf of the Debtors was delegated to Bell. Lancelot I and Lancelot II were managed by Bell through LIM which was the General Partner and/or Investment Manager of those Funds. Colossus LP was managed by Bell through CCM, which was the General Partner and/or Investment Manager of that Fund. From 2002 through 2008, Bell and the Management Companies raised hundreds of millions of dollars by selling interests in the Funds to hundreds of investors throughout the United States and in several foreign countries.

The investors in the Funds included individuals, retirement plans, individual retirement accounts, trusts, corporations, partnerships, and other hedge funds. At all times Lancelot Ltd.'s investors held claims against it based on contractual rights to redemption, and negligence claims relating to Bell's failure to exercise reasonable care regarding Petters' operations.

3

**The Petters Scheme**

Beginning in 1995, Petters and certain of the Petters Entities began raising money by offering and selling Notes. Petters sold the Notes to various feeder funds, which, in turn, raised investment capital from hundreds of private investors. The Notes were issued by Thousand Lakes to finance the purchase of consumer electronics and other goods by retailers such as Costco, Sam's Club, Boscov's, and B.J's (the "Retailers"). It was later discovered that the Notes were issued in connection with a multi-billion dollar Ponzi scheme orchestrated by Petters and his co-conspirators.

In offering and selling Notes, Petters represented to investors and potential investors that the proceeds from the sale of the Notes would be used to finance "purchase order financing" transactions. Purchase order financing allows manufacturers or vendors of goods to obtain immediate payment for goods that have been pre-sold to creditworthy retailers. Under Petters' version of purchase order financing, the Petters Entities arranged for the sale and delivery of end runs or overstocked consumer electronics from manufacturers and then resold the goods to Retailers. For each transaction, Petters and his co-conspirators provided a series of documents to their investors. The documents included a funding request from PCI or its affiliates, executed note documents reflecting the investment and a guaranteed rate of return, purported purchase orders from a retailer, and purported bills of sale from manufacturers to the vendors. However, the entire "purchase order financing" business was a multi-billion dollar Ponzi scheme. There were no goods, no bills of sale, and no purchase orders. Petters and his affiliates created fictitious invoices, purchase orders, and other documents, and used the money they received from investors to make disbursements and other payments to other investors, and to enrich themselves.

4

The goods and merchandise in which the Funds purportedly held a perfected security interest never existed. The Notes held by the Funds were virtually worthless.

**Bell's Round-Trip Transactions**

From 2001 to September 2008, the Funds raised over a billion dollars by selling interests to hundreds of investors. The bulk of the money was unknowingly funneled into Petters' Ponzi scheme.

In December of 2007, Petters told Bell that Costco was late in paying its outstanding invoices, and an agreement was reached between Petters and Bell to extend the term on the Notes from 180 days to 270 days.

In January of 2008, Petters told Bell that Costco would be very late in paying the outstanding invoices. Petters suggested that Bell exchange collateral with Petters and replace the Costco invoices with "good collateral" in the form of invoices from other Retailers that would be paid in 90 days.

Beginning on or about February 26, 2008, Bell and Petters created a series of "round trip" transactions in which Bell wired money to Petters to invest in new Notes secured by purported "good collateral." Petters then wired the money back to Bell to pay off delinquent Notes secured by "bad collateral." These transactions typically occurred within 24 hours, and the purpose and effect was to conceal from the Funds' investors the fact that Thousand Lakes was delinquent in payments to the Funds and to give investors the false impression that Thousand Lakes was paying off its Notes in a timely manner.

On February 26, 2008, the date upon which Bell and Petters began the "round trip" transactions, the Funds became a Ponzi scheme and continued as such until the Petition Date. During this time, the Funds operated at a loss and were not

a legitimate operation. There were no earnings or profits; the only sources of funding were either the "round-trip" transactions or the investments of new investors. While each Fund held separate operating accounts, the investors' funds were commingled in each of the respective operating accounts. The interest and principal payments made to investors were made on account of later investments. Around the time that the Petters Ponzi scheme began to unravel, Bell converted his own Funds into a second level Ponzi scheme in an attempt to keep the Funds afloat for as long as possible.

On December 1, 2008, a Federal Grand Jury in the District of Minnesota indicted Petters in connection with his operation of the Ponzi scheme. On December 2, 2009, Petters was found guilty of all 20 counts charged in the indictment. He was sentenced to 50 years in prison for his crimes.

On September 23, 2009, Bell plead guilty to a single count of wire fraud. On September 30, 2010, he was sentenced to 72 months in prison for his fraudulent activity.

**The Management Fees**

Pursuant to Letter Agreements (entered into between RTL, Ritchie Capital and CCM, and the Ritchie Capital and LIM) Defendants and Equitec Group, LLC and or an affiliate thereof ("Equitec") were seed investors ("Seed Investors") in the Funds. Seed Investors were not involved in the management of the Funds. The investment was a limited partnership subscription in the fund. In return for the seed investment, the Defendants received a percentage of net revenues ("Net Revenues") earned by LIM. The Net Revenues included management fees ("Management Fees") and performance compensation distributed to the Management Companies from the Funds.

Pursuant to the Lancelot Letter Agreement, the Defendants agreed to subscribe for $10,000,000.00 of interests in Lancelot Ltd. LIM agreed to pay Defendants 12.5% of the net revenues ("Net Revenues") earned by LIM. The Parties to the Lancelot Letter Agreement are LIM, Equitec Group, LLC, Pyramid Trading Limited Partnership, and Defendant Ritchie Capital Management, LLC for Defendant RTL Options, Ltd.

Pursuant to the Colossus Letter Agreement, the Defendants agreed to subscribe for $10,000,000 of interests in Colossus LP and/or Colossus Ltd (together, the "Colossus Funds"). CCM agreed to pay Defendants 10% of gross fees and revenues ("Gross Fees and Revenues") received from CCM from or in connection with the Colossus Funds. Parties to the Colossus Letter Agreement are CCM, the Colossus Funds, Equitec Group, LLC, and Defendant Ritchie Capital Management, LLC.

According to the Trustee, these calculations turned out to be overvalued as they were based upon manufactured Notes and fictitious profits. The Trustee contends that because the Management Fees were paid on account of the investments of other investors, they should be disgorged.

The Trustee concedes in his Reply (Adv. No. 10-02088, Dkt. No. 33) that Defendants Thane Ritchie and RTL have no liability in this action. Therefore, the Motion to Dismiss is GRANTED as to Thane Ritchie, and RTL.

### III.  STANDARDS

Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12 made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7012. To satisfy the pleading requirements of Federal Rule of Civil Procedure 8, made applicable to adversary proceedings by Federal Rule of

Bankruptcy Procedure 7008, the complaint must contain "a short and plain statement showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a).[1] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (quoting *Bell Atl.*, 550 U.S. at 556). Dismissal is appropriate only if it is clear in the pleadings that no set of facts could be proven in support of the plaintiff's claims that would entitle him to the relief requested. *Panarus v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 791 (7th Cir. 1996).

## IV. DISCUSSION

In Counts I and II of the Amended Complaint, the Trustee asserts claims for the avoidance and recovery of transfers pursuant to sections 544(b)(1), 548(a)(1)(B) and 550 of the Bankruptcy Code, and the analogous provisions of the Illinois UFTA. *See In re First Commercial Mgmt. Group, Inc.* 279 B.R. 230, 240 (Bankr. N.D. Ill.

---

[1] Defendant brings this motion pursuant to Rule 8 pleading requirements. The Court notes, however, that when a claim is based on fraud the heightened pleading standards of Rule 9(b) apply. Pursuant to Rule 9(b) standards, the plaintiff must state with particularity the circumstances surrounding the fraud. Fed.R.Civ.P. 9(b). Particularity means the who, what, when, where and how; the first paragraph of any newspaper story. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). A complaint asserting a constructive fraud claim must allege what (or how much) was transferred, when the transfer was made, how it was made, who made it, who received it, and under what circumstances. *In re Life Fund 5.1 LLC, et al*, Case No. 09 B 32672, Adv. No. 10 A 42, 2010 WL 2650024, at * 3 (Bankr. N.D.Ill. June 30, 2010).

2002) ("Except for different statutes of limitations, the state and federal statutes are functional equivalents, and the analysis applicable to the first count is also applicable to the second."). To establish a constructive fraudulent transfer claim under each statute, the Trustee must establish that (1) an interest of the debtor's in property was transferred; (2) the transfer of that interest occurred within the applicable statutory period; (3) the debtor received less than "reasonably equivalent value" in exchange for the transfer at issue; and (4) the debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer. 11 U.S.C. § 548(a)(1)(B); 740 ILCS 160/5(a)(2), 160/6(a), 160/8(a).

### a. Trustee has not plead Facts Sufficient to Allege Any Transfers of Interest of the Debtors in Property

Defendants first argue that dismissal is warranted because the Trustee fails to sufficiently plead any transfer of any interest in the debtors in property. "The preliminary requisite for a fraudulent transfer action is whether the interest transferred involved the property of the debtor's estate." *Enron Corp., et al v. Port of Houston Housing Authority* (*In re Enron Corp.*), No. 03 A 92511, 2006 WL 2385194, at *6 (Bankr. S.D.N.Y June 2, 2006).

As to the Complaint herein, the Defendants contend that the relevant allegations of the Complaint, taken as true, would establish that the Management Companies, not the Debtors, agreed to pay Defendants a certain amount; that the Management Companies, not the Debtors, actually paid the Defendants that amount via the Transfers; and that the Management Companies, not the Debtors, paid the Defendants with checks drawn on the Management Companies' accounts. Defendants note that for each of the 24 Transfers set forth in Exhibit B to the Complaint, either LIM or CCM is the transferor, and Ritchie Capital is the recipient.

Further the Defendants contend that the Trustee's allegation that the transfers were made by the Debtors "through their agents LIM and CCM" is insufficient, as the Trustee pleads no facts in support of this claim. *See* Complaint, ¶ 58. The Court agrees.

Pursuant to Illinois law, "[t]he test of agency is whether the purported principal has the right to control the manner and method in which the work is carried out by the agent and whether the agent is capable of subjecting the principal to personal liability." *Knapp v. Hill*, 657 N.E.2d 1068, 1071 (Ill. App. 1st Dist. 1995). "To plead the existence of an agency relationship, the plaintiff must 'allege some factual predicate (even though generalized rather than evidentiary in nature) to create the inference' of agency." *Reeder v. HSBC USA, Inc*, No. 09 C 2043, 2009 WL 4788488, at *4 (N.D. Ill. Dec. 8, 2009); *See also Williams v. Ford Motor Co.*, 990 F.Supp. 551, 554 (N.D. Ill. 1997) ("A Complaint relying on agency must plead facts which, if proved, could establish the existence of an agency relationship.").

In *Reeder*, the court acknowledged that the complaint did not explicitly allege the existence of agency; however, it found that the exhibits to the complaint (which exhibits instructed the plaintiff to make checks payable to an entity) contained a "sufficient factual predicate" to create the inference of an agency relationship. *Reeder*, 2009 WL 4788488, at *4. Applying those standards here, the Court finds that the Complaint does not contain a sufficient factual predicate to create the inference of agency. The Trustee pleads in a conclusory fashion that "[w]ithin the two years prior to the Petition Date, the Debtors transferred to Defendants $1,753,211.00, through their agents LIM and CCM." Complaint, ¶ 58. He also alleges that pursuant to the Lancelot Letter Agreement, executed by Defendant Ritchie Capital Management, LLC for Defendant RTL Options, Ltd., the Defendants agreed to subscribe for $10,000,000.00 of interests in Lancelot LP; and that LIM agreed to pay Defendants 12.5% of the net revenues earned by LIM.

Complaint, ¶¶ 4, 54. In a similar fashion, the Trustee alleges that pursuant to the Colossus Letter Agreement, executed by Defendant Richie Capital Management, LLC, the Defendants agreed to subscribe for $10,000,000 of interests in the Colossus Funds. Complaint at ¶¶ 4, 55; and that CCM agreed to pay Defendants 10% of all Gross Fees and Revenues by CCM from or in connection with the Colossus Funds. Complaint, ¶ 55. These facts, taken together, do not create the inference of an agency relationship between the Defendants and the Management Companies. Rather, the allegations of the Complaint viewed in a light most favorable to the Trustee infer that the payments were made by the Management Companies, not the Debtors, to the Defendants.

The Trustee also contends that the Complaint alleges sufficient facts to infer that the Defendants were the initial transferees because the Management Companies were "mere conduits" to the Transfers because the Management Companies lacked dominion and control over the funds transferred to them by the Debtors. The Court similarly finds that the Trustee's theory in this regard is unsupported by the facts plead in the Complaint.

The mere conduit theory may be used either offensively or defensively. *In re Grenada, Inc.*, 156 B.R. 303, 307 (D. Utah 1990). When used offensively to bypass an intermediary to a transfer, "a trustee may argue that the intermediary merely served as nothing more than a conduit of the funds." *In re Grenada, Inc.*, 156 B.R. at 307. The test to determine whether an entity is the transferee rather than a mere conduit is whether it had "dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the initial transferee." *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 893 (7th Cir. 1988). To satisfy the requirements of *Iqbal* and *Twombly*, the Trustee has to plead sufficient facts which infer that the Management Companies did not have sufficient dominion and control over the disposition of monies received by the Debtors.

Here, the facts as plead do not create a plausible inference that the Management Companies lacked dominion or control over the disposition of the monies received by the Debtors. The Trustee notes in his response that "the issue of whether any entity constitutes a mere conduit is a fact intensive one, and is not properly resolved on a motion to dismiss." However, the Trustee is still charged with satisfying minimum pleading requirements. *Twombly*, 550 U.S. 544, 555 (The plaintiff must provide the "grounds of his 'entitle[ment] to relief' rather than labels, conclusions, or a formulaic recitation of the elements of a cause of action). Specifically, he must plead facts sufficient to infer that the initial recipient, the Management Companies, "did not exercise sufficient dominion and control over the funds transferred to be considered a transferee." *In re Financial Federated Title & Trust, Inc.*, 252 B.R. 840, 843 (Bankr. S.D. Fla. 2000). The Court finds that the Trustee has not done so here.

The allegations of the Complaint herein, viewed in a light most favorable to the Trustee, show that the Management Companies, rather than the Debtors, made the Transfers to the Defendants from money held in the Management Companies' accounts. The Trustee has failed to plead sufficient facts to create a plausible inference that the Management Companies lacked sufficient dominion and control over the funds they received from the Debtors and then transferred to the Defendants, to render the Defendants the initial transferees. The Trustee's Complaint fails to meet the requisite plausibility standard as required by *Iqbal* and *Twombly*.

Counts I and II are DISMISSED with leave to amend within 45 days from the issuance of the Court's Order.[2]

---

[2] The Trustee concedes in his Reply that Defendants Thane Ritchie and RTL are not proper defendants in this action. Therefore, the Trustee is granted leave to amend as to Defendant Ritchie Capital Management, LLC only.

### b.   Trustee has Plead Facts Sufficient to Allege Debtors' Insolvency

Next, the Defendants contend that the Trustee fails to plead sufficient facts to demonstrate that the Debtors were insolvent at the time of each of the 24 transfers, or otherwise meet the financial condition tests required to avoid the transfer.

A party seeking to avoid a transfer as a constructive fraudulent transfer must establish that the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. Insolvency is defined in the Bankruptcy Code as a financial condition that the sum of an entity's debts is greater than such entity's property at fair valuation. 11 U.S.C. § 101(32)(A).

To satisfy the insolvency requirement pursuant to section 548, the Trustee must prove one of the following: (1) the debtor "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation"; (2) the debtor "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital"; (3) the debtor "intended to incur, or believed that the debtor would incur debts that would be beyond the debtor's ability to pay as such debtors matured"; or (4) the debtor "made such transfer to or for the benefit of an insider . . . under an employment contract and not in the ordinary course of business." 11 U.S.C. § 548(a)(1)(B)(ii)(IV). The Trustee must allege facts sufficient to create a plausible inference that each Debtor's liabilities exceeded its assets on the date of each Transfer. *In re Caremerica, Inc.*, 409 B.R. 737, 752 (Bankr. E.D.N.C. 2009).

Here, the Court finds that the Trustee has sufficiently alleged facts which infer Debtors' insolvency on the dates of the Transfers.

Attached as Exhibit B to the Trustee's Complaint is a list of the 24 purported constructive fraudulent transfers which he seeks to avoid and recover. Adv. No. 10-02088, Dkt. No. 22, Exhibit B. The dates of the Transfers range from January 23, 2003 to November 21, 2007.

The Complaint pleads, inter alia, the following allegations respecting the Debtors' Insolvency:

"[D]ebtors collectively held assets for which the book value was listed on Debtors' books and records as approximately $1.8 billion. Those assets were comprised predominately of [N]otes . . . ." (Complaint, ¶ 8).

"The bulk of the assets of the Funds consisted of Notes from the Petters Ponzi scheme, Notes which were and are virtually worthless. The book value of the assets of the Debtors far exceeded their valuation." (Complaint, ¶ 18).

"Debtors had outstanding obligations to others, including, for example, Lancelot Ltd.'s $34,000,000 loan obligation to Charter One Bank, NA pursuant to a credit agreement dated February 24, 2006 . . . ." (Complaint, ¶ 17)

"The bulk of the assets of the Funds consisted of Notes from the Petters Ponzi scheme, Notes which were and are virtually worthless." (Complaint, ¶ 18)

"The book value of the assets of the Debtors far exceeded their fair valuation. Thus the assets of the Debtors were at all relevant times, significantly less than the Debtors' liabilities, including Lancelot Ltd.'s obligations to Charter One and their tort liability to their investors. As a result, Debtors were insolvent, unable to pay their debts as they became due, and had unreasonably small capital at all times due to the amount of their liabilities, including those resulting from investor claims, and

the significant difference between the book value and a fair valuation of their assets." The Trustee also alleges that the Notes were a sham created by Petters to keep the Ponzi scheme functioning. Complaint, ¶¶ 8, 18, 20, 21, 26, 32-36, 56.

"[A]fter February 26, 2008, investors also possessed fraud claims. In short, the investors of the debtors are creditors and their multi-million dollar claims are liabilities." Complaint, ¶ 16.

The Court finds that these allegations, viewed in a light favorable to the plaintiff Trustee, together with the Trustee's claim that "beginning in 1995, Petters began offering and selling notes which were issued in connection with a multi-billion dollar Ponzi scheme" sufficiently infer that the Debtors' were insolvent on the transfer dates ranging from the years 2003 through 2007. (Complaint, at ¶¶ 22, 26). *See Whitley v. Swofford*, No. 10-10426, Adv. No. 11-02038, 2012 WL 170135, at *6 (Bankr. M.D.N.C. Jan. 19, 2012) ("Plaintiff's allegation, although technically 'a formulaic recitation of the elements of a cause of action' is nevertheless sufficient: by definition, Ponzi-style investment schemes are insolvent.") (internal citation omitted); *In re Lancelot Investors Fund, LP, et al v. Altradius Trade Credit Ins. Inc., et al*, 451 B.R. 833, 839 (Bankr. N.D. Ill. 2011) ("The law presumes that debtors who engage in Ponzi schemes are insolvent because by definition a Ponzi Scheme inevitably becomes insolvent at some point.") (internal citation omitted).

### c. Theory of Unjust Enrichment Not Available to Trustee

Count III of the Complaint seeks disgorgement of $12,042,550.00 in Management Fees pursuant to the Lancelot Letter Agreement and $490,418.00 pursuant to the Colossus Letter Agreement under an unjust enrichment theory. Trustee alleges that the Defendants were recipients of net revenues of fraudulently obtained proceeds to which they have no rightful claim, and therefore they must in equity be required to disgorge all proceeds. Defendants argue that this claim should

be dismissed because, inter alia, the rights of the parties were governed by contract. For the reasons that follow, Count III is dismissed with prejudice.

"Unjust enrichment is a 'quasi-contract' theory that permits courts to imply the existence of a contract where none exists to prevent unjust results." *Cordes & Co., LLC v. Mitchell Companies, LLC,* 605 F.Supp.2d 1015, 1023 (N.D. Ill. 2009). "When two parties' relationship is governed by a contract, they may not bring a claim for unjust enrichment unless the claim falls outside the contract." *Utility Audit, Inc. v. Horace Mann. Serv. Corp.,* 383 F.3d 683, 688-89 (7th Cir. 2004) (internal citation omitted).

The relationships amongst the parties involved in this proceeding were governed by contract. As the Trustee alleges in the Complaint, the relationship between the Management Companies (LIM and CCM) and the Debtors was governed by "limited partnership and other agreements." Complaint, ¶ 14. In addition, the Defendants' relationship with the Management Companies was governed by the Letter Agreements, which entitled the Defendants to certain fees in exchange for their performance under the contracts. Complaint, ¶ 54.

Because the $12,532,973 the Trustee seeks to disgorge was governed by the parties' respective contracts, the Count III claim for unjust enrichment is DISMISSED with prejudice.

### d. Count IV Claim for Disallowance is Dismissed

Section 502(d) of the Code "requires that the court disallow 'any claim' of any entity from which property is recoverable by a trustee, or that is the transferee of an avoidable transfer, unless and until the property is turned over and the transfer is paid." *In re Sierra-Cal,* 210 B.R. 168, 173 (Bankr. E.D.Cal. 1997); 11 U.S.C. § 502(d). Because the Court finds that Trustee has not sufficiently plead a claim

16

under Counts I – III of the Complaint, Count IV is also dismissed, without prejudice.

## V. CONCLUSION

For the reasons noted herein, the Motion to Dismiss Trustee's First Amended Complaint is Granted. Counts I, II and IV are dismissed, without prejudice. The Count III claim for unjust enrichment is dismissed with prejudice.

The Trustee may file an amended complaint within 45 days of the issuance of the order dismissing Counts I, II and IV.

A separate Order will issue Granting the Motion to Dismiss on Counts I, II and IV with leave to amend. The Court notes that it may enter its Order Dismissing Counts I, II and IV without prejudice, because it does not qualify as an appealable final judgment. *Muzikowski*, 322 F.3d at 923.

Before the Court enters its Order on the unjust enrichment claim, it invites the parties to submit briefs by March 25, 2012 on whether the Order would resolve core matters on which this Court may enter a final order in light of the Supreme Court's ruling in *Stern v. Marshall*, 131 S. Ct. 2594 (2011) and the Seventh Circuit's ruling in *Ortiz v. Aurora*, 665 F.3d 906 (7th Cir. 2011).

Dated: March 2, 2012          ENTERED:   *Jacqueline P. Cox*
                              *J. Cox*
                              _____
                              Jacqueline P. Cox
                              United States Bankruptcy Judge

17